# United States Court of Appeals for the Federal Circuit

————————————

**CANADIAN SOLAR, INC., CHANGZHOU TRINA SOLAR ENERGY CO., LTD., HEFEI JA SOLAR TECHNOLOGY CO., LTD., SHANGHAI JA SOLAR TECHNOLOGY CO., LTD., YINGLI GREEN ENERGY HOLDING COMPANY LIMITED, YINGLI GREEN ENERGY AMERICAS, INC.,**
*Plaintiffs-Appellants*

**SHANGHAI BYD CO., LTD., BYD (SHANGLUO) INDUSTRIAL CO., LTD., CHINA SUNERGY (NANJING) CO., LTD., CHINT SOLAR (ZHEJIANG) CO., LTD., ET SOLAR INDUSTRY LTD., JINKO SOLAR CO., LTD., LDK SOLAR HI-TECH (NANCHANG) CO., LTD., PERLIGHT SOLAR CO., LTD., RENESOLA JIANGSU LTD., SHENZHEN SACRED INDUSTRY CO., LTD., SHENZHEN SUNGOLD SOLAR CO., LTD., SUMEC HARDWARE & TOOLS CO., LTD., SUNNY APEX DEVELOPMENT LTD., WUHAN FYY TECHNOLOGY CO., LTD., WUXI SUNTECH POWER CO., LTD., ZHONGLI TALESUNSOLAR CO., LTD., ZNSHINE PV-TECH CO., LTD., SUNPOWER CORPORATION,**
*Plaintiffs*

**v.**

**UNITED STATES, SOLARWORLD AMERICAS, INC.,**
*Defendants-Appellees*

————————————

2017-2577

————————————

Appeal from the United States Court of International Trade in Nos. 1:15-cv-00067-CRK, 1:15-cv-00083-CRK, 1:15-cv-00087-CRK, 1:15-cv-00088-CRK, 1:15-cv-00089-CRK, 1:15-cv-00090-CRK, Judge Claire R. Kelly.

————————————

Decided: March 12, 2019

————————————

SPENCER STEWART GRIFFITH, DEVIN S. SIKES, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, argued for plaintiffs-appellants.

TARA K. HOGAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by REGINALD THOMAS BLADES, JR., ROBERT EDWARD KIRSCHMAN, JR., JOSEPH H. HUNT; SCOTT DANIEL MCBRIDE, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC.

TIMOTHY C. BRIGHTBILL, Wiley Rein, LLP, Washington, DC, argued for defendant-appellee SolarWorld Americas, Inc. Also represented by STEPHANIE MANAKER BELL, TESSA V. CAPELOTO, LAURA EL-SABAAWI, CYNTHIA CRISTINA GALVEZ, USHA NEELAKANTAN, ADAM MILAN TESLIK, MAUREEN E. THORSON.

————————————

Before NEWMAN, O'MALLEY, and CHEN, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

This is an appeal from a judgment of the Court of International Trade sustaining a remand determination from the U.S. Department of Commerce ("Commerce"). *SunPower Corp. v. United States*, 253 F. Supp. 3d 1275 (Ct.

Int'l Trade 2017) ("*Solar II China*"). In its remand determination, Commerce imposed countervailing and antidumping duties on the importation of a class or kind of merchandise—specifically, solar cells and modules, laminates, and/or panels (collectively, "panels"), containing solar cells imported or sold for importation to the United States from the People's Republic of China ("China"). Final Results of Redetermination Pursuant to Ct. Order, *Sun-Power Corp. v. United States*, No. 15-00067 (Oct. 5, 2016) ("*Solar II China Remand Results*"), ECF No. 105-1. When defining the class or kind of merchandise within the scope of the orders, Commerce used a new test, rather than the typically-used "substantial transformation" test, to determine the country of origin. Appellants contend that Commerce failed to provide a reasoned explanation for departing from its previous practice and that substantial evidence does not support its findings. Because we conclude that Commerce provided a reasoned explanation and that substantial evidence supports its findings, we affirm.

## I. BACKGROUND

### A. Legal Framework

The Tariff Act of 1930, as amended, authorizes Commerce to initiate countervailing or antidumping duty investigations, and, in certain circumstances, impose duties on foreign merchandise sold, or likely to be sold, in the United States. 19 U.S.C. §§ 1671, 1673. Specifically, Commerce may impose countervailing duties "to address government subsidies to foreign producers," and it may impose antidumping duties to "provide relief from market distortions caused by foreign producers who sell their merchandise in the United States for less than fair market value," so long as the U.S. International Trade Commission ("Commission") finds that those activities materially injure or threaten to materially injure domestic industry. *Bell Supply Co. v. United States*, 888 F.3d 1222, 1225 (Fed. Cir. 2018).

A countervailing or antidumping duty investigation typically begins with a petition filed by a domestic industry. *Id.* If the investigation reveals dumping or foreign subsidies that injure the domestic industry, Commerce must issue an order imposing countervailing or antidumping duties. In this order, Commerce describes the class or kind of merchandise within the scope of the order in two parts—first, the type of merchandise, i.e., its technical characteristics, and second, the merchandise's country of origin. *Certain Cold-Rolled Carbon Steel Flat Prods. From Argentina*, 58 Fed. Reg. 37,062, 37,065 (Dep't of Commerce July 9, 1993); *see Glob. Commodity Grp. LLC v. U.S.*, 709 F.3d 1134, 1140 (Fed. Cir. 2013) (affirming Commerce's class or kind determination because it "appropriately accounts for both the physical scope of the product as well as the country of origin.").

Commerce typically determines country of origin based on the country where the merchandise is processed or manufactured. *See Cold-Rolled Carbon*, 58 Fed. Reg. at 37,065. But, in circumstances in which the merchandise undergoes partial processing or manufacturing in multiple countries, Commerce relies on the substantial transformation test. *Id.* Under the substantial transformation test, a solar cell manufactured in country A, but assembled into a panel elsewhere would cease to be from country A if, as a result of the assembly process, the solar panel "loses its identity and is transformed into a new product having a new name, character and use." *Bell Supply*, 888 F.3d at 1228 (quoting *Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999)).

## B. The Parties & The Merchandise

SolarWorld, an appellee in this appeal, is a domestic producer of solar products. It initiated the trade remedy investigations from which this appeal arises by filing petitions alleging injury to the domestic solar industry. The appellants in this appeal—Canadian Solar, Inc.,

Changzhou Trina Solar Energy Co., Ltd., Hefei JA Solar Technology Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Yingli Green Energy Holding Company Limited, and Yingli Green Energy Americas, Inc.—export and/or produce the class or kind of merchandise within the scope of Commerce's orders from/in China.

While the parties agree on the *type* of merchandise within the scope of Commerce's order—crystalline silicon photovoltaic cells, and modules, laminates, and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials—they dispute whether Commerce erred in its country of origin analysis.

## C. Procedural History

Commerce's orders at issue in *Solar II China* are the subject of this appeal, but two prior sets of orders are relevant to the issues before us. Each of these is detailed below.

### 1. *Solar I China*

On November 16, 2011, Commerce initiated countervailing and antidumping investigations based on petitions filed by SolarWorld. The investigations resulted in countervailing duty and antidumping duty orders covering both solar cells and solar panels containing solar cells from China. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) (antidumping duty order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) (countervailing duty order) (collectively, "*Solar I China*").

Because some solar cells manufactured in China can be assembled into panels elsewhere and because some solar cells manufactured elsewhere can be assembled into panels

in China, Commerce applied the substantial transformation test to determine the country of origin. Commerce determined that the solar cell is the origin-conferring component because the process of assembling the solar cells into panels does not constitute a substantial transformation. *SunPower*, 253 F. Supp. 3d at 1279 & n.3. Commerce therefore concluded that the duty orders covered solar cells and solar panels from China—including solar panels assembled outside of China using Chinese solar cells, but excluding solar panels assembled in China using non-Chinese solar cells. *Id.*

### 2. *Solar I Taiwan*

SolarWorld later filed petitions alleging that imports of solar cells and panels from Taiwan had increased, causing injury to the domestic solar industry. *Id.* at 1280. Commerce initiated an antidumping investigation and eventually issued an antidumping duty order. *Id.* In its order, Commerce applied the substantial transformation test to conclude—as it had in *Solar I China*—that the solar cells are the origin-conferring input. *Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 80 Fed. Reg. 8,596 (Dep't of Commerce Feb. 18, 2015) (antidumping duty order) ("*Solar I Taiwan*"). Thus, the scope of the order in *Solar I Taiwan* covers Taiwanese solar cells and solar panels—including solar panels assembled elsewhere using Taiwanese solar cells and excluding solar panels assembled in Taiwan using non-Taiwanese solar cells. *Id.* at 8,596.

### 3. The Proceedings Below

#### a. Commerce's Decision Regarding *Solar II China* Orders

On October 19, 2011, SolarWorld filed petitions concerning imports of the subject merchandise from China. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 76 Fed. Reg. 70,960 (Dep't of Commerce Nov. 16, 2011)

(antidumping duty inv. initiation); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 76 Fed. Reg. 70,966 (Dep't of Commerce Nov. 16, 2011) (countervailing duty inv. initiation). In its petitions, SolarWorld alleged that the Chinese solar industry had shifted its trade flows to circumvent the orders in *Solar I China* by assembling panels using only non-Chinese cells. *Id.*

Commerce initiated investigations and, on December 23, 2014, published final orders imposing countervailing and antidumping duties. *Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 76,962 (Dep't of Commerce Dec. 23, 2014) (antidumping duty order); *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,970 (Dep't of Commerce Dec. 23, 2014) (countervailing duty order). To determine the country of origin, Commerce declined to use the substantial transformation test. Rather, it concluded that the country of assembly confers origin regardless of whether the assembly process substantially transforms the merchandise ("the country of assembly test"). To justify departing from its previous practice, it pointed to the following facts and circumstances unique to *Solar II China*:

> (1) the unique nature of the solar products industry in light of the readily adaptable supply chain and record evidence of a shift in trade flows following the implementation of the [*Solar I China*] Orders; (2) [Commerce]'s concerns that the scope language in the Petitions would be neither administrable nor enforceable, and could invite further evasion of any resulting order; and (3) the fact that [Commerce] needed a mechanism to address the alleged injury to the domestic industry, which stemmed, in relevant part, from modules assembled in [China]

using third-country solar cells, and which would not be captured by a traditional substantial transformation analysis.

*SunPower*, 253 F. Supp. 3d at 1283. Thus, Commerce concluded that the class or kind of merchandise within the scope of the orders included all solar panels assembled in China consisting of non-Chinese cells and excluded any products covered by existing orders, such as those in *Solar I China*. *Id.*

### b. Court of International Trade Remands

On March 18, 2015, appellants filed complaints challenging both *Solar II China* and *Solar I Taiwan* in the Court of International Trade. *Id.* They then moved for judgment on the administrative record, arguing that Commerce's scope determination in *Solar II China* "was inconsistent with the agency's prior practice for determining country of origin in similar proceedings, and departed from that practice without sufficient explanation." *Id.* The Court of International Trade agreed. It found that "Commerce's final scope determinations departed from the agency's prior rule for determining national origin for solar panels" and that it did so "without adequate consideration or discussion of the continuing relevance, if any, of Commerce's prior factual finding that the assembly of imported solar cells into panels is insufficient to change the product's country-of-origin from the country of cell-production to the country of panel-assembly." *Id.* at 1284 (quoting *SunPower v. United States*, 179 F. Supp. 3d 1286, 1288–89 (Ct. Int'l Trade 2016)). Accordingly, on June 8, 2016, the Court of International Trade remanded the proceeding to Commerce. *Id.* On remand, it ordered Commerce to explain "its departure from its prior practice of using a single country of origin test for a particular class or kind or merchandise" and its "dissimilar treatment of similarly situated merchandise." *Id.*

### c. Commerce's Remand Decision

In its remand decision, Commerce explained why its country of origin determination in *Solar II China* differed from its determinations in *Solar I China* and *Solar I Taiwan*. Commerce explained at the outset that it has broad discretion to determine the applicable scope of an order. *Solar II China Remand Results*, slip op. at 17. It stated that it did not apply different country of origin rules to the same class or kind of merchandise. *Id.* This is so because, according to Commerce, the class or kind of merchandise in *Solar II China* was not the same class or kind of merchandise in *Solar I China* or in *Solar I Taiwan*. *Id.* at 17. Rather, it reasoned, each class or kind determination is proceeding-specific. Accordingly, it found that the three sets of orders differed in scope based on which products from which countries were found to cause injury to the domestic industry. *Id.* Therefore, Commerce explained, it did not apply a different country of origin test to the same class or kind of merchandise. *Id.* at 22.

Commerce also explained that using the country of assembly in this case would "best effectuate the purpose of the antidumping [and countervailing duty] laws and the violation found." *Id.* at 24 (quoting *Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1583 (Fed. Cir. 1990)). According to Commerce, the country of assembly test would allow it to fashion an order that addresses the very imports found to cause injury.

Commerce then explained why it departed from the substantial transformation test. It acknowledged that, in *Solar I China* and *Solar I Taiwan*, it had found that the process of panel assembly does not transform solar cells and that, therefore, the solar cells are the origin-conferring component. *See id.* at 25. But it also recognized that the circumstances underlying its orders in *Solar I China* and *Solar I Taiwan* differed in significant ways from the circumstances underlying the orders in *Solar II China*.

Specifically, it "recognized that the harm alleged in the [*Solar II China*] petitions was connected with the activities in [China]" and that record evidence demonstrated shifts in trade flows and evasion related to solar panels assembled in China following issuance of the *Solar I China* orders. *Id.* No similar evidence of harm was alleged or presented in the record in *Solar I Taiwan* or *Solar I China*. *Id.* These differing circumstances in *Solar II China*, it reasoned, justified departing from the substantial transformation test because "a rote application of a substantial transformation analysis would not allow [Commerce] to address unfair pricing decisions and/or unfair subsidization concerning the [panels] that is taking place in the country of export." *Id.* at 5–6.

Appellants challenged Commerce's remand determination in the Court of International Trade, arguing that Commerce unlawfully created two country of origin rules for products within the same type of merchandise and that it impermissibly departed from the substantial transformation test without a reasoned explanation for doing so.

### d.  Court of International Trade's Decision

The Court of International Trade affirmed Commerce's remand decision. It agreed with Commerce's conclusion that what is the "class or kind of merchandise" in a countervailing duty or antidumping duty determination is a proceeding-specific inquiry, and that, therefore, the classes or kinds of merchandise in *Solar I China*, *Solar I Taiwan*, and *Solar II China* are distinct because the scopes of those orders are distinct. *SunPower*, 253 F. Supp. 3d at 1287–88. It also found that Commerce had explained sufficiently why it departed from the substantial transformation test in *Solar II China*. Specifically, it found that "it was reasonable for Commerce to determine that the appropriate country-of-origin for subject merchandise within the investigation was the country of panel assembly" because, here, "the harm alleged and ultimately confirmed in [*Solar II*

*China*] was specific to solar panels that had been assembled in China." *Id.* at 1288. Based on these conclusions, the Court of International Trade affirmed Commerce's decision.

Appellants timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

As noted above, the Tariff Act authorizes Commerce to impose countervailing and/or antidumping duties on a "class or kind of [foreign] merchandise" imported or sold for importation into the United States if Commerce finds that the merchandise reflects unfair pricing or unfair subsidization and the Commission finds material injury to the domestic industry. 19 U.S.C. §§ 1671(a)(1), 1673(1). Within these orders, Commerce shall include "a description of *the subject merchandise*, in such detail as the administering authority deems necessary." §§ 1671e(a)(2), 1673e(a)(2) (emphasis added). The Tariff Act defines "subject merchandise" as "the class or kind of merchandise that is within the scope of an investigation [or] an order under this subtitle." § 1677(25).

The Tariff Act does not require Commerce to define the "class or kind of [foreign] merchandise" in any particular manner. Because the Tariff Act is silent in this regard, Commerce has the authority to fill that gap and define the scope of an order consistent with the countervailing duty and antidumping duty laws. *SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001) (stating that, when a statute is silent, "agencies are entitled to formulate policy and make rules to fill any gap left, implicitly or explicitly, by Congress" (internal quotations omitted)). But, even when a "statute is silent . . . with respect to [a] specific issue," Commerce's determination must be "based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Accordingly, Commerce must exercise its discretion "in

light of all the facts before" it and in a manner that reflects Commerce's "judgment regarding the scope and form of an order that will best effectuate the purpose of the [Tariff Act] and the violation found." *Mitsubishi*, 898 F.2d at 1583.

Commerce's authority to define the class or kind of merchandise within the scope of an order encompasses the authority to determine the country of origin. *Bell Supply*, 888 F.3d at 1228–29; *see also Global Commodity*, 709 F.3d at 1140 (affirming Commerce's class or kind of merchandise determination because it "appropriately accounts for both the physical scope of the product as well as the country of origin"). But if, in determining the country of origin in a given order, Commerce deviates from a previous policy or practice, it must provide an explanation for doing so. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–49 (1983); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). We review Commerce's explanation under the arbitrary and capricious standard, meaning that we consider whether Commerce's determination is the product of reasoned decisionmaking. *State Farm*, 463 U.S. at 43–44. Reasoned decisionmaking or a reasoned explanation does not require Commerce to show that the reasons for the new policy are better than the reasons for the prior policy. *Fox*, 566 U.S. at 515. Rather, an explanation is reasoned if Commerce demonstrates that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* And, if Commerce's "new policy rests upon factual findings that contradict those which underlay its prior policy," the reasoned explanation must justify "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

Here, appellants argue that, because Commerce typically uses the substantial transformation test to determine country of origin for merchandise produced in more than one country and because Commerce used that test in

earlier orders regarding solar panels, it should have, but failed to provide a reasoned explanation under *State Farm* for departing from that practice in *Solar II China*.[1] Appellants also argue that, even if Commerce provided a reasoned explanation, substantial evidence does not support its findings.  As explained below, we conclude that Commerce provided a reasoned explanation for its departure under *State Farm* and that substantial evidence supports its findings.

### A.  Commerce Provided a Reasoned Explanation Under *State Farm*

It is undisputed that the test Commerce used to determine the class or kind of merchandise within the scope of the *Solar II China* orders differs from the test it used to determine the scope of its *Solar I China* and *Solar I Taiwan* orders.  It is also undisputed that, if Commerce had used the substantial transformation test in defining the scope of these orders, it would have concluded that the country of cell production confers origin because the process of assembling the solar cells into solar panels does not substantially transform those solar cells.  But, here, Commerce determined that the country of assembly determines origin, regardless of whether the assembly process substantially transforms the merchandise at issue.  We find that Commerce provided a reasoned explanation for using

---

[1]    Although appellants argued to the Court of International Trade that "class or kind of merchandise" is not proceeding-specific, they do not pursue that argument on appeal.  *See* Oral Arg. at 3:33, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2017-2577.mp3.  Rather, they contend that, regardless of whether the term is proceeding-specific, Commerce must provide a reasoned explanation when it departs from the practice employed in earlier proceedings when defining the scope of its current orders. *Id.*

the country of assembly test and for departing from its previous practice in this case.

Commerce explained why its "new policy is permissible under the statute[s]." *Fox*, 566 U.S. at 515. Specifically, Commerce explained that, once the Commission finds that certain imports are causing injury to the domestic injury, Commerce must provide a remedy that addresses those imports. *Solar II China Remand Results*, slip op. at 20–21. According to Commerce, that is exactly what it did here when it used the country of assembly test. *Id.* at 21. Only that test, it reasoned, would include within the scope of the orders the very imports found to injure the domestic industry—solar panels assembled in China using non-Chinese solar cells. *See id.*, slip op. at 5, 23. Commerce found that applying the country of assembly test to these facts would therefore, "best effectuate the purpose of the antidumping [and countervailing duty] laws and the violation found." *Id.* at 24 (quoting *Mitsubishi*, 898 F.2d at 1583). In other words, in these investigations, Commerce determined that the harm to domestic industry was caused, not by Chinese solar cells or solar panels containing Chinese cells, but by Chinese pricing and subsidization of solar panels assembled in China using non-Chinese cells. *Id.* at 22.

We agree. We conclude that it was reasonable for Commerce to use the country of assembly test to determine country of origin. This is because it is reasonable to use the country where the merchandise was assembled to define the class or kind of merchandise within the scope of the orders—especially where, as here, the very imports found to cause injury due to unfair pricing and/or subsidies were *panels assembled in China* containing cells produced in other countries. Indeed, "[i]t would make little sense for Commerce to expend significant resources investigating certain imports, and for the [Commission] to determine that those imports were causing injury to a domestic industry, if Commerce were precluded from including those imports within the scope of the . . . order[s] arising out of

the . . . investigation[s]." *NTN Bearing Corp. of Am. v. United States*, 997 F.2d 1453, 1457 (Fed. Cir. 1993). Commerce has the discretion to alter the country of origin test it uses when the harm suffered by the domestic industry justifies such alteration.

We also find that Commerce provided "good reasons for" departing from the substantial transformation test. *Fox*, 566 U.S. at 515. Commerce explained that the departure was necessary because "its standard substantial transformation analysis would be insufficient for determining the country-of-origin of this specific product because relying on the substantial transformation analysis alone could result in failure to provide relief to the domestic industry for the alleged injury." *Solar II China Remand Results*, slip op. at 46 (internal quotation marks and citation omitted). We agree that is a good reason for departing from the substantial transformation test—indeed, "rote application" of the substantial transformation test would be inadequate to remedy the unfair pricing decisions and/or unfair subsidization because it would exclude the very imports found to injure the domestic industry. *Id.*

Commerce also explained that a departure was necessary because the Chinese solar industry, anticipating a rote application of the substantial transformation test, had shifted its supply chains so that their solar imports to the United States would no longer fall within the class or kind of merchandise defined in *Solar I China*. *Id.* at 48–49. We agree that this is another good reason for departing from the substantial transformation test. The Chinese solar industry—recognizing that the solar cells were defined as the origin-conferring component under the substantial transformation test—began sourcing the solar cells from other countries. In this way, the industry was using the substantial transformation test as a means of circumventing the duties imposed by the orders. Thus, it was reasonable for Commerce to depart from the substantial transformation test in view of these evasion concerns.

Appellants contend that evasion concerns are irrelevant to determining from where the imports originate. But Commerce did not use evasion concerns to determine country of origin. It determined the country of origin based on the country of assembly, and it cited evasion concerns to justify departing from its previous practice of using the substantial transformation test. As noted above, using the place of assembly in this case is a reasonable means of determining country of origin, and evasion concerns constitute a reasoned explanation for departing from Commerce's previous practice. Therefore, appellants' argument fails.

Finally, Commerce also explained its reasons for disregarding its previous factual findings regarding the relative insignificance of panel assembly in determining country of origin. *Fox*, 566 U.S. at 515–16. It acknowledged that, just like in *Solar I China* and *Solar I Taiwan*, panel assembly does not substantially transform the solar cells at issue in *Solar II China*. But, in the previous two investigations, no similar shift in trade flow and evasion of duties was alleged or established. And the harm to domestic industry in those cases was found to be from the importation of Chinese or Taiwanese solar cells—and solar panels containing Chinese or Taiwanese solar cells. The additional record evidence in *Solar II China* justified disregarding the facts and circumstances underlaying the prior practice in *Solar I China* and *Solar I Taiwan* because the harm could be traced to the importation of solar panels assembled in China using non-Chinese solar cells.

For these reasons, we conclude that Commerce provided a reasoned explanation for departing from the substantial transformation and using the country of assembly test.

### B.  Substantial Evidence Supports
### Commerce's Determination

Appellants contend that substantial evidence does not support Commerce's determination that the Chinese solar industry was shifting its supply chains to evade duties because Commerce relied on mere allegations from Solar-World's petitions.  But SolarWorld submitted documents in support of its allegations, including public admissions of shifting supply chains and data of increased importation of non-Chinese solar cells into China.  Commerce weighed the available evidence and ultimately agreed with SolarWorld that appellants were attempting to evade the duties imposed by the *Solar I China* orders.

Specifically, Commerce found that five large Chinese solar panel producers and one U.S. importer publicly admitted "the ease with which they were able to modify their production chain to avoid paying" the duties imposed by the *Solar I China* orders.  *Solar II China Remand Results*, slip op. at 49 n.131 (citing SolarWorld's Petition, *Solar II China* at 4 (J.A. 41) ("*Recharge* reported that 'in the future, [Trina Solar Limited] will outsource cells from Canada or Taiwan to work around the tariffs.'"), *id.* ("[T]he President of Trina Solar Europe stated that 'the modules that we're shipping now to the U.S. have solar cells that are made from outside of China and so in that sense we're not so affected by the [tariffs]'"), 5 (J.A. 42) (quoting statement from Suntech analyst indicating that "Suntech will experience no further impact [because it is] sourcing all cells outside of China going forward for all [its] U.S. shipments, so [it has] no exposure to tariffs"), *id.* ("Canadian Solar, which makes most of its panels in China, has been buying solar cells from Taiwan for years as part of its supply chain strategy, said Chief Financial Officer Michael Potter.  Now all U.S.-bound [panels] would be made with these slightly more expensive Taiwanese cells to avoid the tariff.")).

Commerce also found that these public admissions reflected reality—that the Chinese solar industry was in fact sourcing solar cells from other countries at an increased frequency following the *Solar I China* orders. *Solar II China Remand Results*, slip op. at 49 n.131 (citing Solar-World's Petition, *Solar II China* at 21 (J.A. 53.1) (describing chart depicting extremely high levels of shipments of solar cells from Taiwan to China in the third quarter of 2013), 37 (J.A. 53.3) (describing reports that Chinese producers switched from using Chinese cells to using cells from other countries), *id.* (quoting industry article stating that, "ever since U.S. duties on cells came into effect, every cell/module maker from China active in America has sourced cells from Taiwan and other regions that have not been affected by the decision" (emphasis omitted))). Indeed, the plaintiffs[2] submitted responses during the investigation indicating that the bulk of their own imports to the United States were panels made with non-Chinese solar cells. J.A. 403 (quoting Renesola Jiangsu Ltd.'s response that "[a]ll of Renesola's sales during the [period of investigation] were of modules assembled in China using cells produced in Korea and Taiwan," Jinko Solar Co., Ltd.'s response that it "assume[s] all its sales during the period of investigation were subject to the scope of the investigation," and Trina Solar Energy's response that it had "reported all sales of Chinese modules not covered by the scope of the original investigations").

Finally, the record indicates that appellants never denied shifting their supply chains to evade duties.[3]

---

[2] "Plaintiffs" encompasses appellants as well as other parties who were involved in the proceedings below but are not involved in this appeal.

[3] During oral argument, appellants claimed that the record evidence was disputed below. *See* Oral Arg. at 39:05. In support of this claim, appellants directed the

*SunPower*, 179 F. Supp. 3d at 1291–92 ("As a factual matter, no party challenges this shift of production or its negative effect on the reach of the [*Solar I China*] orders."); *Solar II China Remand Results*, slip op. at 20 ("In other words, there is undisputed evidence that Chinese producers of solar [panels] shifted part of their production in a way that pulled merchandise that otherwise would be covered by the *Solar I* [*China* orders] outside the remedy afforded by those orders."). Therefore, substantial evidence supports Commerce's finding.

## C. Appellants' Remaining Arguments Are Unpersuasive

Appellants also contend that there are other means of preventing circumvention. They contend that "a petitioner like SolarWorld has the ability to file additional petitions related to unfairly-priced and unfairly-subsidized solar products that are produced in other countries." Appellants Br. at 43. But, as Commerce found:

> [T]he length of time that it would take to file a petition, for the Department to initiate and conduct an investigation, for the [Commission] to conduct its own investigation and reach a final determination, eventual publication of an antidumping

---

court to pages from their reply brief in support of their motion for judgment on the agency record. *Id.* (citing J.A. 469–71). Contrary to appellants' claim, these pages do not indicate that appellants ever challenged the veracity of Commerce's findings—i.e. they never denied shifting trade flows in an effort to evade the duties imposed in *Solar I China*. Rather, they argued that Commerce cannot rely on mere allegations of such activity in its country of origin analysis. Thus, it appears from the record that appellants never disputed engaging in evasive tactics once the record of such activities was developed.

and/or countervailing duty order if both [Commerce]'s and the [Commission]'s final determinations were affirmative, and thereafter, for [Commerce], a year later, to conduct an administrative review, trade flows likely could have already shifted to another country.

*Solar II China Remand Results*, slip op. at 48. We agree with Commerce. It is unnecessary for Commerce to engage in a game of whack-a-mole when it may reasonably define the class or kind of merchandise in a single set of orders, and within the context of a single set of investigations, to include all imports causing injury.

Appellants contend that another means of preventing circumvention is the anti-circumvention statute. 19 U.S.C. § 1677j. But, as the Court of International Trade found, this statute applies "to circumstances where an order with a defined scope is already in effect." *SunPower*, 253 F. Supp. 3d at 1290 n. 20 (quoting *SunEdison, Inc v. United States*, 179 F. Supp. 3d 1309, 1319 (Ct. Int'l Trade 2016)). Here, Commerce is defining the scope of an order prior to its imposition. And, even if Commerce found this statute applicable, we have previously concluded that "§ 1677j is meant to address [specific types of] attempts at circumvention, [but does] not preclude Commerce from making a country of origin determination in the first instance."[4] *Bell Supply*, 888 F.3d at 1231.

## IV. CONCLUSION

For the reasons stated above, we find that Commerce provided a reasoned explanation for its departure from the substantial transformation test and that its findings are supported by substantial evidence. We therefore affirm.

---

[4]    We have considered appellants' other remaining arguments and find them unpersuasive.

## AFFIRMED

COSTS

No costs.